UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
KENNETH ZAHL, M.D., individually and
on behalf of his child,

        Plaintiff,

   -v-

KAREN KOSOVSKY. M.D., et al.,

        Defendants.
----------------------------------------------------------x

No. 08 Civ. 8308 (LTS)(THK)

<div style="border:1px solid">
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:   0 3 MAR 2011
</div>

## MEMORANDUM OPINION AND ORDER

      Plaintiff Kenneth Zahl, M.D.,[1] ("Plaintiff" or "Zahl") brings this action pro se against

Karen Kosovsky, M.D. ("Kosovsky"), Harry Kosovsky, M.D., and Gertrude Kosovsky (with

Kosovsky, the "Kosovsky Defendants"). Kevin McKeown ("McKeown"). Robert Dobrish, Esq. and

Dobrish, Zeif, Gross, Wrubel, LLP (the "Dobrish Defendants"), Jo Ann Douglas, Esq. ("Douglas"),

SoftSplit LLC and Soft Split Kids LLC (the "Soft Split Defendants"), New York State Supreme

Court Justice Marilyn G. Diamond,[2] individually, New York State Supreme Court Justice Joan B.

Lobis, in her individual and official capacities, New York State Supreme Court Justice Laura

Visitacion-Lewis, in her official capacity, Justice Jonathan Lippman,[3] in his individual and official

---

[1]    Zahl purports to bring this action individually and on behalf of his daughter. However, "a non-attorney parent must be represented by counsel in bringing an action on behalf of his or her child." Cheung v. Youth Orchestra Foundation of Buffalo, Inc, 906 F.2d 59, 61 (2d Cir. 1990). The Court therefore dismisses, sua sponte, the claims brought on Zahl's daughter's behalf. See Berrios v. New York City Housing Authority 564 F.3d 130, 134 (2d Cir. 2009) (citing Wenger v. Canastota Central School District 146 F.3d 123, 125 (2d Cir. 1998)).

[2]    The caption names "Judge Marylin G. Diamond." The New York State Unified Court System website confirms that the Court's spelling is correct.

[3]    Then- Justice Lippman is now the Chief Judge of the New York State Court of Appeals.

Copies mailed/faxed to  _MK ZAhl_
Chambers of Judge Swain  _3-3-2011_

capacities, and Justice Jacqueline Silbermann, in her individual and official capacities (the "Judicial Defendants"), the New York State Unified Court System and its Office of Court Administration ("NYS UCS" and "OCA," respectively, and together with the Judicial Defendants, the "State Defendants"), and John and Jane Does 1 through 100, seeking a declaratory judgment pursuant to 28 U.S.C. § 2201 and asserting causes of action pursuant to 42 U.S.C.§§ 1983, 1985(3), and 1986, the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C.§ 1962(b), (c) and (d), Title III of the Omnibus Crime Control and Safe Streets Act of 1968, ("Wiretap Act"), 18 U.S.C§ 2511(1)(a), 18 U.S.C. § 1708, 42 U.S.C. § 408(a)(7), 18 U.S.C. §§ 1503 and 1512, New York Penal Law Articles 155 and 175, Section 487 of the New York Judiciary Law, and common law civil conspiracy. In a series of motions, all defendants except the Soft Split and Doe defendants (the "Moving Defendants") move to dismiss the complaint pursuant to Rules 8(a) and 12(b) of the Federal Rules of Civil Procedure, as inadequately plead, for lack of subject matter jurisdiction and for failure to state claims upon which relief may be granted. Plaintiff asserts that the Court has original jurisdiction of his federal claims and supplemental jurisdiction of his state law claims. The Court has considered thoroughly the parties' submissions and, for the following reasons, the Moving Defendants' motions will be granted in their entirety and the case will be dismissed in its entirety.

---

[4]    The Soft Split Defendants have not entered appearances, although the Court has received several communications from an individual through whom Soft Split Kids was purportedly served and who claims no affiliation with that entity. The Court has suspended Plaintiff's effort to obtain default judgments against the Soft Split entities pending resolution of the instant motion practice.

<u>BACKGROUND</u>

The Complaint includes the following factual allegations.[5] Plaintiff and Defendant Karen Kosovsky were married on September 9, 1990. (Compl. ¶ 36.) Plaintiff and Kosovsky's daughter, A.Z., was born on June 4, 1991. (Id. ¶ 22.) Plaintiff and Kosovsky separated on A.Z.'s second birthday, and later that year Kosovsky filed for divorce in New York County Supreme Court. (Id. ¶¶ 40-41.) Defendant Robert Dobrish, who is the managing partner of Defendant Dobrish, Zeif, Gross, Wrubel, LLP, has represented Kosovsky in the state matrimonial action at all relevant times. (Id. ¶¶ 24-25.) A thirteen-day trial was held in 1993 on the issue of custody of A.Z. before Justice David Saxe (Id. ¶ 199), culminating in a decision issued in February 1996 awarding sole custody to Kosovsky with "liberal" visitation to Zahl. (Id. ¶ 202.) The divorce aspect of the action, including the issues of child support and distribution of assets, was bifurcated and left for a later date. (Id.) Justice Saxe was elevated to the Appellate Division shortly after issuing the custody decision. (Id. ¶¶ 202, 222.)

The case was reassigned to several different judges over the next year, and Justice Saxe's custody decision was modified several times. (Id. ¶¶ 220-23, 233, 238.) Shortly after Justice Saxe's departure, defendant Jo Ann Douglas was appointed as a law guardian to represent A.Z. (Id. ¶ 223.) The case was eventually assigned to Justice Marilyn Diamond in or around April 1997. (Id. ¶¶ 239, 243.) At about this time Plaintiff became unable to continue paying his attorney and proceeded pro se in the matrimonial action. (Id. ¶ 247.) Plaintiff alleges that Justice Diamond overrode the random assignment procedure normally used to assign judges to matrimonial cases in order to ensure that the case would be assigned to her. (Id. ¶¶ 240-42.) Justice Diamond reappointed Jo Ann

---

[5]     The 367-page long Complaint contains 702 paragraphs, with many subparagraphs. In light of Plaintiff's pro se status, the Court has endeavored to construe the Complaint liberally.

Douglas as law guardian, (Id. ¶ 250), and ultimately presided over the "divorce and financial phase" of the action, including distribution of assets and determination of child support. (Id. ¶ 239.) Justice Diamond also issued an order on February 24, 1999, regarding custody of A.Z., modifying prior custody orders.[7] (Id. ¶ 329.)

In or around August 2002 Plaintiff filed a petition, pro se, in New York Family Court, seeking to enforce Justice Diamond's custody order entitling him to limited visitation and thus "restore a relationship with AZ." (Compl. ¶¶ 478, 480.) At about the same time Karen Kosovsky filed a motion relating to child support in New York Supreme Court, which was assigned to Defendant Justice Lobis, and Plaintiff agreed to have his petition transferred to Justice Lobis for joint consideration with the child support motion. (Id. ¶ 481.) Plaintiff alleges that Justice Diamond contacted Justice Lobis in October 2002 in order to "prejudice [Justice Lobis] against Dr. Zahl and continue to terminate Dr. Zahl's parental rights" and to "manipulate[]" Justice Lobis. Id. ¶ 562.) A hearing was held on February 28, 2003 (Id. ¶ 491), at the conclusion of which Justice Lobis refused to enforce the Diamond custody order or to disqualify defendants Robert Dobrish and Jo Ann Douglas.[8] (Compl. ¶ 495.)

In or about August 2007, Plaintiff filed a petition for a writ of habeas corpus in New York County Family Court seeking to "redress the lack of contact [between Plaintiff and A.Z.], and illegal acts by some of the named defendants." (Id. ¶ 500.) The Family Court judge assigned to the

---

[6]     The Appellate Division, First Department, decision affirming the judgment and related orders notes that judgment of divorce was entered on July 10, 1998. Kosovsky v. Zahl, 684 N.Y.S.2d 524, 525 (App. Div. 1999).

[7]     This order, modified on March 3, 1999 (Decl. of Kate Burson ("Burson Decl."), Ex. D), was affirmed by the Appellate Division, First Department. Kosovsky v. Zahl, 707 N.Y.S.2d 168 (App. Div. 2000).

[8]     Justice Lobis issued two written decision, both of which refer to the "post-judgment matrimonial action," dated January 27, 2003, and April 14, 2003, addressing these and other issues. (See Burson Decl., Exs. E and I.)

petition ruled in Plaintiff's favor with respect to certain preliminary matters. [d. ¶ 503-06.) Robert Dobrish, presumably on behalf of Karen Kosovsky, filed an application for an Order to Show Cause to have the habeas petition "removed back" to Justice Lobis shortly before the "return date" in Family Court. (Id. ¶ 506.) Justice Lobis transferred Plaintiff's petition to the post-judgment enforcement section of the Matrimonial Section of the New York County Supreme Court, where it was assigned to Defendant Justice Visitacion-Lewis. (Id. ¶ 507.) Justice Visitacion-Lewis reappointed Douglas as law guardian, issued the Order to Show Cause, consolidated Plaintiff's petition with the post-judgment matrimonial action, and "suspended" Plaintiff's habeas corpus petition by an order issued in November 2007. (Compl.¶¶ 513, 515, 516; Burson Decl., Ex. G.) Justice Visitacion-Lewis's decision was affirmed on appeal by the Appellate Division, First Department. (Compl. ¶ 515.) Justice Visitacion-Lewis dismissed Plaintiff's petition on October 14, 2008. (See Burson Decl., Ex. H.)

No later than 2003, Plaintiff became aware of the existence of the Soft Split Defendants and their connection to other defendants. (Compl. ¶¶ 437, 493.) The Soft Split Defendants provided individuals affected by divorce with resources meant to help them cope with the attendant difficulties, including anonymous access through a website to a "faculty" of lawyers, mental health professionals, and accountants. (Id. ¶¶ 434-77.) Defendants Robert Dobrish and Jo Ann Douglas were affiliated with the Soft Split Defendants. (Id. ¶ 437.)

Plaintiff asserts that during the litigation of the state matrimonial action, up through the trial before Justice Diamond, the Kosovsky Defendants, the Dobrish Defendants, and McKeown harassed, intimidated, surveilled, and stole from Plaintiff, all in order to undermine his ability to

---

[9]     It appears from the appellate decision that, in connection with Plaintiff's habeas corpus petition, a so-called Lincoln hearing was scheduled and that Plaintiff was ordered to have no contact with A.Z. until after that hearing, but that the petition was not actually suspended. Kosovsky v. Zahl, 859 N.Y.S.2d 442 (N.Y. App. Div. 2008).

present his case at trial and ultimately deprive him of access to A.Z. Plaintiff alleges that, to that end, the Kosovsky Defendants hired "armed private investigators"led by McKeown to provoke public confrontations during transfers of A.Z. which they videotaped in the hope of catching Plaintiff behaving objectionably. (Id. ¶¶ 41, 201, 204, 206.) The Kosovsky Defendants or McKeown sent anonymous derogatory letters and faxes to Plaintiff's colleagues, employees and other associates. (Id. ¶ 103.) McKeown's team of armed private investigators followed Plaintiff during his trips to pick up A.Z., using multiple cars, video cameras, and eavesdropping on Plaintiff's cellular telephone calls. (Id. ¶¶ 335-339, 360-61.) Occasionally, the Kosovskys or the investigators confronted Plaintiff physically, and some private investigators displayed weapons. (Id.) The Kosovskys contacted the police in early June 1993 and claimed that Plaintiff was armed and intended to kidnap A.Z., and that he had assaulted Karen Kosovsky, causing eight police officers to approach Plaintiff with guns drawn while he was sitting in his car with two year old A.Z. on his lap. (Id. ¶ 339.) McKeown used the transcript of Plaintiff's psychiatrist's deposition, taken by Dobrish, to induce New Jersey authorities to revoke Plaintiff's gun permit on trumped up accusations. (Id. ¶¶ 356-59.) When A.Z. was three or four years old, the Kosovskys had their private investigators videotape Plaintiff reading to A.Z. while in his twenty-first floor apartment in Manhattan. (Id. ¶ 363.) McKeown also illegally obtained Plaintiff's telephone records (id. ¶¶ 364-71, 373-74) and bank records (id. ¶ 375), searched his trash (Id. ¶ 372), and harassed Plaintiff's current wife, attempting to dissuade her from marrying him in 1998 (id. ¶¶ 381-85). McKeown wrote a book entitled "Your Secrets are my Business," published in 2000, which detailed the activities he had undertaken at the behest of the Kosovsky Defendants. (Id. ¶¶ 23, 207, 340, 352-85).

The Kosovskys "withheld" A.Z. from Plaintiff in violation of court orders (id. ¶¶ 199-200, 208-09, 217-18), and coached A.Z. to make false allegations of abuse against Plaintiff (id. ¶ 245). During the divorce trial, Dobrish presented a pension statement that was stolen from Plaintiff's

ZHAI M.1D3.WPD        VERSION 3/3/11        6

possession and used it to create the false impression that Plaintiff had lied on his "Statement of Net Worth." (Id. ¶¶ 265-69.) Dobrish also introduced an illegally obtained letter written by Plaintiff's secretary to a patient and confidential patient records to falsely imply that Plaintiff had surreptitiously siphoned money from his medical practice and had performed a medical procedure that showed his disability claim to have been fraudulent. which submission induced Justice Diamond to rule against Zahl on a number of issues. (Id. ¶¶ 271-75.)

The Complaint seeks visitation with A.Z., other injunctive relief, and money damages in respect of litigation-related attorneys' fees and expenses and allegedly excessive child support obligations imposed by the state court. It is rife with allegations of bias and misconduct by the state judicial officers and institutions that have handled the Zahl-Kosovsky domestic relations litigation. Indeed, Plaintiff characterizes the Matrimonial Part of the New York State Supreme Court and other participants in the litigation and related matters as a "Matrimonial Mafia Enterprise" and the "NY Matrimonial Mafia Inc." in connection with his RICO claims. (See, e.g., Compl. ¶¶ 578, 607.) The various deprivations and obligations of which Plaintiff complains are traceable to the judicial decisions, including the appointments of a guardian ad litem for A.Z. and the assessment of costs and fees relating to the guardianship, made in the course of the state court litigation.

## DISCUSSION

The pending motions raise several grounds for dismissal of the complaint, the most pertinent of which are discussed here.

"Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Arar v. Ashcroft, 532

F.3d 157, 168 (2d Cir. 2008) (internal citations and quotation marks omitted). "[T]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." Morrison v. National Australia Bank Ltd, 547 F.3d 167, 170 (2d Cir. 2008) (quotingNatural Res. Def. Council v. Johnson, 461 F.3d 164, 171 (2d Cir. 2006)). However: "[a] plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists," id. (quoting Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)), and "that showing is not made by drawing from the pleadings inferences favorable to the party asserting" subject matter jurisdiction. Id. (quoting APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003)). In determining whether it has subject matter jurisdiction of the claims, the court may rely on evidence outside the pleadings. Id.

Rooker-Feldman Doctrine

The Rooker-Feldman doctrine deprives lower federal courts of subject matter jurisdiction of any claim "that asserts injury based on a state judgment and seeks review and reversal of that judgment." Hoblock v. Albany County Board of Elections 422 F.3d 77, 86 (2d Cir. 2005). A district court's exercise of jurisdiction in such a case would be tantamount to appellate review of the state court judgment, in violation of 28 U.S.C. § 1257, which vests federal appellate jurisdiction of state court judgments exclusively in the United States Supreme Court. See Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 291-92 (2005). Rooker-Feldman applies only when four requirements are met:

> First, the federal-court plaintiff must have lost in state court. Second,
> the plaintiff must "complain[ ] of injuries caused by [a] state-court
> judgment[.]" Third, the plaintiff must "invit[e] district court review
> and rejection of [that] judgment[ ]." Fourth, the state-court judgment
> must have been "rendered before the district court proceedings
> commenced" – i.e., Rooker-Feldman has no application to
> federal-court suits proceeding in parallel with ongoing state-court
> litigation.

Hoblock, 422 F.3d at 85 (alterations in original) (quoting Exxon Mobil Corp., 544 U.S. at 284). "The first and fourth of these requirements may be loosely termed procedural; the second and third may be termed substantive." Id.

All of the Moving Defendants assert that the Court lacks jurisdiction of Plaintiff's claims because all of the claims are, in essence, attacks on the state court decisions in the matrimonial proceedings and seek modification or reversal of the decisions. Defendants' point is well-taken – Plaintiff seeks a declaration that all of the complained-of actions (including the custody, child support and law guardian appointment decisions) were illegal such that they may be adjudicated null and void, and seeks damages for expenses incurred in connection with the proceedings and/or by virtue of the state court orders.

The Court first considers the "substantive" Rooker-Feldman requirements. A federal suit is barred only to the extent that "it complains of injury from the state-court judgment and seeks review and rejection of that judgment, but not [to the extent that] it raises 'some independent claim.'" Hoblock, 422 F.3d at 86 (quoting Exxon Mobil Corp., 544 U.S. at 293). If the claim in the federal suit was not raised in state court but "nonetheless complains of injury from a state-court judgment and seeks to have that state-court judgment reversed," then it is not independent. Id. The substantive requirements encompass all claims "whether or not raised in state court, that assert[] injury based on a state judgment and seek[] review and reversal of that judgment." Id.; see also McKithen v. Brown, 481 F.3d 89, 97-98 (2d Cir. 2007) ("[T]he applicability of the Rooker-Feldman doctrine turns not on the similarity between a party's state-court and federal-court claims . . . but rather on the causal relationship between the state-court judgment and the injury of which the party complains in federal court."). The Second Circuit's discussion, in Hoblock, of a hypothetical case in which a federal court plaintiff who relies on a theory not raised in state court but is nevertheless barred by the Rooker-Feldman doctrine is instructive here because it describes a situation similar to that presented in this

case.

> Suppose a state court, based purely on state law, terminates a father's parental rights and orders the state to take custody of his son. If the father sues in federal court for the return of his son on grounds that the state judgment violates his federal substantive due-process rights as a parent, he is complaining of an injury caused by the state judgment and seeking its reversal. This he may not do, regardless of whether he raised any constitutional claims in state court, because only the Supreme Court may hear appeals from state-court judgments.

Hoblock, 422 F.3d at 87. This hypothetical is also similar to the situation underlying the Supreme Court's decision in Rooker v. Fidelity Trust Co., which held that federal district courts lack subject matter jurisdiction to entertain a suit seeking to have a state court judgment "declared null and void." 263 U.S. 413 (1923). The Supreme Court explained that "[i]f the [state court] decision was wrong, that did not make the judgment void, but merely left it open to reversal or modification in an appropriate and timely appellate proceeding." Id. at 415. Because the district court did not have appellate jurisdiction, it was without authority to adjudicate the matter. Id. at 416.

In the instant case, "state court[s], based purely on state law," adjudicated the matrimonial proceedings, including child custody and support issues, between Kenneth Zahl and Karen Kosovsky. Zahl now sues in federal court for the reestablishment of his right to greater visitation with his child — i.e., for the reversal of the state court judgment – on the ground that the state decisions violate his federal constitutional rights, and for a declaration to that effect. Plaintiff also asserts other claims, including RICO claims, but all of his claims of injury in the form of lost contact and untoward expenses arise fundamentally from the state judges' decisions in the state court matrimonial proceedings. Plaintiff's claims thus fall squarely within the Rooker-Feldman doctrine's substantive requirements because they seek to redress injuries caused by the state court judgments by way of review and modification or reversal of those judgments. Id. at 86.

The Court now turns to the "procedural" Rooker-Feldman requirements. It is

uncontested that Plaintiff lost in state court with respect to each decision that forms the basis of his claims. The first requirement is therefore met. Judgment was entered in 1999 and was thus rendered before the instant action was commenced, on September 26, 2008. Proceedings were held subsequent to the entry of judgment, including the 2003 denial of Plaintiff's petition to enforce the 1999 modified custody order and rulings relating to Plaintiff's 2007 habeas corpus petition (although final disposition of that petition had not occurred as of the time of the filing of the instant action). Justice Lobis expressly referred to the state court action as one in a "post-judgment" posture when she decided the matters before her in 2003. The distinction between the earlier "judgment" and each post-judgment "decision and order," which did not contemplate any further proceedings and which were no longer appealable at the time the instant action was filed, is purely nomenclatural and thus immaterial for Rooker-Feldman purposes. The fourth requirement, that the state court judgment have been rendered prior to the commencement of proceedings in district court, is satisfied as to these decisions.

The November 2007 order by Justice Visitacion-Lewis, however, was not final when this case was commenced. It was issued in clear contemplation of further proceedings, namely the resolution of the merits of the habeas corpus petition, which was still pending after the issuance of the subject order. Plaintiff's appeal of the November 2007 order was affirmed in June 2008, before this action was filed, and Justice Visitation-Lewis dismissed the petition on October 14, 2008. To the extent that the non-finality of the November 2007 interlocutory order precludes the dismissal of the claims pertaining to that order pursuant to the Rooker-Feldman doctrine, the Court abstains from exercising jurisdiction of those claims for the reasons stated infra.

Because the four Hoblock requirements are met with respect to Plaintiff's claims insofar as they seek relief from the requirements or consequences of the state courts' orders, the Court is without jurisdiction of those claims. Accordingly, Counts I-X, XII, and XVII are dismissed.

Eleventh Amendment

The State Defendants seek dismissal of the claims against NYS UCS and OCA and all claims asserted against the Judicial Defendants in their official capacities, on grounds of immunity under the Eleventh Amendment to the Constitution. Each state, as well as "state agents and state instrumentalities that are, effectively, arms of a state." enjoy sovereign immunity under the Eleventh Amendment from suit, including those brought by the state's own citizens. See, e.g., Woods v. Rondout Valley Central School Dist. Bd of Educ, 466 F.3d 232, 236 (2d Cir. 2006) (citations and internal quotation marks omitted). Eleventh Amendment immunity may be waived or abrogated by Congress. See Gollomp v. Spitzer, 568 F.3d 355. 366 (2d Cir. 2009) (citing Woods, 466 F.3d at 236). There is no indication, and Plaintiff does not argue, that the State Defendants have waived, or that Congress has abrogated, their Eleventh Amendment immunity.

"[T]he New York State Unified Court System is unquestionably an 'arm of the State,' and is entitled to Eleventh Amendment sovereign immunity." Gollomp, 568 F.3d at 368 (2d Cir. 2009) (citing Woods. 466 F.3d at 236). State officials sued in their official capacity are likewise entitled to Eleventh Amendment sovereign immunity because "the real party in interest in an official-capacity suit is the governmental entity and not the named official." See Hafer v. Melo, 502 U.S. 21, 25 (1991) (discussing Kentucky v. Graham, 473 U.S. 159 (1985) and Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978)). Official-capacity sovereign immunity extends to a state judge sued in her official capacity. See, e.g., Sundwall v. Leuba, 28 Fed. App'x 11 (2d Cir. 2001); Morris v. Main, No. 08 Civ. 813 (GLS) (DRH), 2009 WL 890634, at *2 (N.D.N.Y. Mar. 31, 2009); Winkler v. Grant, No. 07 Civ. 6280T. 2008 WL 1721758, at *2 (W.D.N.Y. Apr. 8, 2008); Daniel v. Safir, 135 F. Supp. 2d 367, 372 (E.D.N.Y. 2001);Brown v. City of New York, 210 F. Supp. 2d 235, 237 (S.D.N.Y. 1999). Therefore, Plaintiff's claims against NYS UCS and OCA and his claims against the Judicial Defendants, to the extent they are asserted against those defendants in their

official capacities and do not seek purely prospective relief, are barred by the Eleventh Amendment.

Accordingly, Counts I, III-X, and XVII are dismissed to the extent that they are asserted against NYS UCS and OCA or any Judicial Defendant in his or her official capacity. However, the Eleventh Amendment does not bar official-capacity claims against state officials seeking only prospective relief. See Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (citingEx parte Young, 209 U.S. 123 (1908)). The only such claim, Count II, is therefore not subject to Eleventh Amendment sovereign immunity.[10]

Younger Abstention

Count II of the Complaint seeks to have this Court "enjoin the efficacy of the [sic] New York Judge Visitacion-Lewis'[s]order removing Zahl's Habeas Corpus Petition from Family Court" (Compl. ¶ 622), and impose a "prospective injunction prohibiting**the continued denial of contact with A.Z., the forced payment of up to $7,000 monthly to Defendant Karen Kosovsky in child support and add-on expenses**" (id. ¶ 624) (emphasis in original). It appears that Plaintiff was seeking to preclude the Supreme Court from taking further action on the habeas petition that he had initiated in Family Court, and to obtain an injunction against enforcement of the custody and child support orders of the state court.[11]

In Younger v. Harris, the Supreme Court reminded lower federal courts that it had "repeat[ed] time and time again that the normal thing to do when federal courts are asked to enjoin

---

[10]   Count II seeks to enjoin the "efficacy" of Judge Visitacion-Lewis's November 2007 order, have this Court either take jurisdiction of the state habeas corpus petition or remand it to Family Court, prohibit the continued denial of contact between Plaintiff and his daughter, and terminate the monthly child support and add-on expense payments.

[11]   To the extent that Plaintiff's claim in Count II seeks to enjoin enforcement of prior orders, rather than to enjoin the habeas corpus proceedings in state court, that claim is a direct challenge to the validity of those prior orders and must be dismissed on Rooker-Feldman grounds for the reasons discussed above.

pending proceedings in state courts is not to issue such injunctions." 401 U.S. 37, 45 (1971). This rule of abstention reflects "a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances." Middlesex County Ethics Committee v. Garden State Bar Ass'n 457 U.S. 423, 431 (1982). Although Younger itself involved an attempt to enjoin a state criminal prosecution, "[t]he policies underlying Younger are fully applicable to noncriminal judicial proceedings when important state interests are involved." Middlesex, 457 U.S. at 432. "Younger generally prohibits courts from 'taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings' so as to avoid unnecessary friction." Spargo, 351 F.3d at 75 (quoting Diamond "D" Constr. Corp. v. McGowan, 282 F.3d 191, 198 (2d Cir. 2002)). Younger abstention is mandatory when three conditions are met: "(1) there is a pending state proceeding, (2) that implicates an important state interest, and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of his or her federal constitutional claims." Spargo, 351 F.3d at 75. However, even when these conditions are met "a federal court may still intervene in state proceedings if the plaintiff demonstrates bad faith, harassment or any other unusual circumstance that would call for equitable relief." Id. at 75, n. 11 (internal quotations and citations omitted).

Count II seeks to enjoin the state court from acting on a pending state habeas corpus proceeding in which Plaintiff asserted essentially the same claims as he does here. The first and third requirements for mandatory abstention are therefore met. In addition, "few interests can be considered more central than a state's interest in regulating its own judicial system." Id. at 75. Just as it would be improper for a federal court "to substitute itself for the State's appellate courts,"Huffman v. Pursue, Ltd., 420 U.S. 592, 609 (1975), it is equally inappropriate for a federal court to substitute itself for the state's adjudicator of petitions for post judgment relief. The state has an important interest in ensuring that its "judicial system [will] be fairly accorded the opportunity to resolve

federal issues arising in its courts." Id. The second requirement for mandatory abstention is therefore also met.

Plaintiff's allegations of misconduct by Justice Diamond and interference by Justice Diamond with Justice Lobis's decisions in 2003 do not defeat the propriety of Younger abstention. They are not directed at the judge who presides over the pending state proceedings, Justice Visitacion-Lewis. Those allegations do not call into doubt Justice Visitacion-Lewis's ability to properly adjudicate Plaintiff's constitutional claims in the context of his state court habeas corpus petition. Accordingly, Count II is hereby dismissed.

Judicial Immunity

A judge has absolute judicial immunity from suit with respect to claims brought against her in her individual capacity, provided that her actions were taken in her judicial capacity and not "in the complete absence of all jurisdiction." Mireles v. Waco, 502 U.S. 9, 11-12 (1991). "[J]udicial immunity is not overcome by allegations of bad faith or malice." Id. at 11. "[W]hether an act by a judge is a 'judicial' one relate[s] to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity." Id. at 12 (second alteration in original) (quoting Stump v. Sparkman, 435 U.S. 349, 362 (1978)). "The fact that a proceeding is 'informal and ex parte . . . has not been thought to imply that an act otherwise within a judge's lawful jurisdiction was deprived of its judicial character.'" Bliven v. Hunt, 579 F.3d 204, 210 (2d Cir. 2009) (quoting Forrester v. White, 484 U.S. 219, 227 (1988)). With the exception of certain actions allegedly taken by Justice Diamond, all of the Judicial Defendants' actions of which Plaintiff complains (including but not limited to decisions regarding custody, law guardianship and compensation therefor, child support and litigation expense allocation) were acts "normally performed by a judge" and are therefore within the scope of absolute judicial immunity.

ZRM M1D.wpd            VERSION 3 3 11                                                              15

Plaintiff asserts that Justice Diamond is not entitled to judicial immunity because she allegedly manipulated the assignment system to take control of Plaintiff's case, and because she failed to recuse herself for alleged conflict of interest. Plaintiff cites no relevant authority in support of his conclusory assertions that such actions vitiated Justice Diamond's jurisdiction to handle his case, and the Court has found none.

The failure of a judge to recuse herself in light of a conflict of interest does not deprive her of all jurisdiction to try the case before her, so as to deprive her of judicial immunity. See, Sylvester v. Sorrell, No. 08-CV-88, 2009 WL 819383, at *3 (D. Vt. March 25, 2009) (citing Haynes v. Schimelman, 2000 WL 502623, at *1 (D. Conn. March 8, 2000));cf. Rudow v. City of New York, 822 F.2d 324, 328 (2d Cir. 1987) (conflict of interest does not defeat prosecutorial immunity, which, like judicial immunity, requires that the prosecutorial act not have been undertaken in the absence of jurisdiction). Furthermore, "the scope of the judge's jurisdiction must be construed broadly where the issue is the immunity of the judge. A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority." Stump, 435 U.S. at 356. An erroneous application of the law, even if it causes significant harm to a party, is an act in excess, but not in the absence, of jurisdiction and does not deprive the judge of immunity. Id., at 357, n.7 (explaining that even convicting a criminal defendant of an nonexistent crime is not an act undertaken without jurisdiction).

Plaintiff's claims against the Judicial Defendants are premised on the judges' alleged misapplication of the law and consequent alleged violation of Plaintiff's constitutional rights. These are precisely the kinds of claims from which the Supreme Court has held judges to be immune. The Judicial Defendants are therefore entitled to absolute judicial immunity as to all claims arising out of these judicial acts asserted against them in their individual capacities. Accordingly, Counts I, III-X, and XVII are dismissed to the extent that they are asserted against any Judicial Defendant in his or

her individual capacity.

Law Guardian Immunity

Defendant Douglas, regardless of "whether [she acted] as a 'law guardian' or guardian ad litem," is similarly entitled to absolute quasi-judicial immunity. Lewittes v. Lobis, 164 Fed. App'x 97, 98 (2d Cir. 2006); see also Yapi v. Kondratyeva, No. 07-4800-CV, 2009 WL 2030359, at *1 (2d Cir. 2009). Accordingly, Counts I, IV, and VI-XII are hereby dismissed as against Douglas.

Failure to State Claims

When deciding a motion to dismiss a complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true the non-conclusory factual allegations in the complaint, and draws all reasonable inferences in Plaintiff's favor. Roth v. Jennings, 489 F.3d 499, 501 (2d Cir.2007); see also Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 129 S.Ct. at 1949 (citing Bell Atlantic v. Twombly, 550 U.S. 544, 555 (2007)). To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. This plausibility standard governs pleadings in all civil actions. Iqbal, 129 S. Ct. at 1953. "Even after Twombly, though, [courts] remain obligated to construe a pro se complaint liberally." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009).

No Private Right of Action for Certain Claims

Plaintiff purports to assert claims for violations of N.Y. Penal Law Articles 155 and 175 (Count XI), 18 U.S.C. § 1708 (Count XIV), 42 U.S.C. § 408(a)(7) (Count XV), 42 U.S.C. §§ 1028 and 1029 (Count XVI), and 18 U.S.C. §§ 1503 and 1512 (Count XVII). However, these criminal statutes do not provide for a private right of action and Plaintiff provides no authority

suggesting otherwise. See, e.g., Peavey v. Holder, No. 05-819 (RWR), 2009 WL 3080464, at *9

(D.D.C. Sept. 28, 2009) (no private right of action pursuant to 18 U.S.C. § 1503);Bates v.

Northwestern Human Services, Inc., 466 F. Supp. 2d 69, 100 (D.D.C. 2006) (no private right of

action pursuant to 42 U.S.C. § 408); Alexander v. Washington Gas Light Co., 481 F. Supp. 2d 16,

33 (D.D.C. 2006) (same); Lucas-Cooper v. Palmetto GBA, No. 05-cv-00959, 2006 WL 2583407, at

*3 (N.D. Ohio Sept. 7, 2006) (no private right of action pursuant to 42 U.S.C. § 1028); Fraser v.

Fiduciary Trust Co., Intern., No. 04 Civ. 6958(RMB)(GWG), 2005 WL 6328596, at *14 (S.D.N.Y.

June 23, 2005) (no private right of action pursuant to 18 U.S.C. § 1512); Moore v. New York City

Dept. of Education, No. 03 Civ. 2034 (LAP), 2004 WL 691523, at *5 (S.D.N.Y. Mar. 31, 2004)

(no private right of action under N.Y. Penal Law §§ 175.40 and 195.00); Garay v. U.S. Bancorp,

303 F. Supp. 2d 299, 302-03 (E.D.N.Y. 2004) (no private right of action pursuant to 42 U.S.C. §

1028); Booth v. Bannon, No. Civ. 01-147-JO, 2001 WL 34736641, at *1 (D. Or. June 8, 2001)

(same); Bartolomeo v. Liburdi, No. 97-0624-ML, 1999 WL 143097, at *2 (D.R.I. Feb. 4, 1999).  In

general, in determining whether a criminal statute implies a private right of action "the 'dispositive

question' is whether Congress intended to create a private right of action," and courts "are to be

'especially reluctant' to imply a private right of action where the statute explicitly provides a different

remedy."  Alaji Salahuddin v. Alaji, 232 F.3d 305, 308 (2d Cir. 2000) (citations omitted).  In the

absence of any authority to support an implied right of action pursuant to the above-named criminal

statutes, the Court remains "especially reluctant" to infer such a right.  Accordingly, Counts XI and

XIV-XVII are hereby dismissed.

### Statutes of Limitations

Under the federal "discovery rule" a claim accrues when the "plaintiff knows or has

reason to know of the injury which is the basis of his action."  Pearl v. City of Long Beach, 296 F.3d

76, 80 (2d Cir. 2002) (quoting Singleton v. City of New York 632 F.2d 185, 191 (2d Cir. 1980)).
While the 367-page Complaint is not entirely coherent, it is clear that Plaintiff had suffered and
discovered the injuries which give rise to his claims, namely the loss of his relationship with his
daughter and the imposition of the financial burdens resulting from the support and add-on expense
determinations, by the time of Judge Lobis's "decision and order" on April 14, 2003. By that date,
Justice Diamond had issued the July 10, 1998, judgment of divorce, including the resolution of the
outstanding financial issues and the February 24, 1999, order modifying the prior custody order, and
Justice Lobis had issued the orders of January 27, 2003, and April 14, 2003, and had heard oral
argument on Plaintiff's petition and Karen Kosovsky's motion on February 28, 2003. These two
judges had also made the appointments of defendant Jo Ann Douglas and the various "forensics" to
which Plaintiff objected. Indeed, Plaintiff alleges no new injury, other than the continuation and
extension of the existing injuries, after April 2003. Plaintiff's claims therefore accrued no later than
April 14, 2003.

Plaintiff contends that the accrual of his claims should be delayed or the running of
the statutes of limitations should be tolled on two grounds. Plaintiff first argues that the ongoing
nature of the Defendants' alleged conspiracies tolls the statutes of limitations. However, it is well
established that the limitations period is not affected by the existence of an ongoing conspiracy that
encompasses otherwise time-barred claims. See, e.g., Pinaud v. County of Suffolk 52 F.3d 1139,
1157 (2d Cir. 1995); Csoka v. County of Suffolk 85 F. Supp. 2d 117, 121 (E.D.N.Y. 2000);
Covington v. City of New York 916 F. Supp. 282, 286 (S.D.N.Y. 1996). Plaintiff also argues
conclusorily that Defendants' fraudulent concealment tolls the statutes of limitations. To succeed in
tolling the limitations period on this argument, Plaintiff must prove: "(1) wrongful concealment by
[Defendants], (2) which prevented [his] discovery of the nature of the claim within the limitations
period, and (3) due diligence in pursuing the discovery of the claim." In re Merrill Lynch Ltd. P'ship

Lit., 154 F.3d 56, 60 (2d Cir. 1998). However, Plaintiff proffers no facts substantiating any instance of concealment alleged to have occurred or continued in or after 2003, and instead points to recent events that are manifestly in open view (namely, the ongoing litigation in state court).[12] Therefore, neither the time of accrual nor the running of the limitations periods is affected.

### Section 1983, 1985 and 1986 Claims

Federal courts apply the federal "discovery rule" for claim accrual and the "general or residual [state] statute [of limitations] for personal injury actions" to section 1983 claims. Pearl, 296 F.3d at 79-80 (alterations in original) (quoting Owens v. Okure, 488 U.S. 235, 249-50 (1989)). In this case, that period is three years. See id. (citing N.Y. C.P.L.R. § 214(5)). Similarly, the statute of limitations for section 1985 claims is three years. See Paige v. Police Dept. of Schenectady, 264 F.3d 197, 199 n.2 (2d Cir. 2001) (citing Cornwell v. Robinson, 23 F.3d 693, 704 (2d Cir. 1994)). Therefore, the limitations period expired no later than April 14, 2006, and Plaintiff's section 1983 and 1985 claims are untimely. Section 1986 claims are subject to a one year statute of limitations. 42 U.S.C.A. § 1986 (West 2003). Accord Paige, 264 F.3d at 199 n.2. Therefore, the limitations period expired no later than April 14, 2004, and Plaintiff's section 1986 claims are untimely. Accordingly, Counts III-V are dismissed in their entirety.

### RICO Claims

While RICO claims are subject to the same accrual rule as other federal claims, see Merrill Lynch, 154 F.3d at 58, they are also capable of "separate accrual," starting a new limitations period running each time a "new and independent" RICO violation occurs, id. at 59 (citing Bankers

---

[12]    In any event, Plaintiff had ample opportunity to discover the non-State Defendants' alleged contribution to his injuries by April 14, 2003. He attempted to present evidence during the divorce trial of the Kosovsky Defendants' and Dobrish's misappropriation and improper use of certain documents, and Defendant McKeown's 2000 book detailed all of his actions, on behalf of the Kosovsky Defendants, to torment Plaintiff and undermine his rights in the matrimonial action.

Trust Co. v. Rhoades, 859 F.2d 1096, 1103 (2d Cir. 1988)). See also Rotella v. Wood, 528 U.S. 549, 554 (2000) (adopting the injury discovery rule for RICO claims). This is because "in some instances a continuing series of fraudulent transactions undertaken within a common scheme can produce multiple injuries which each have separate limitations periods." Merrill Lynch, 154 F.3d at 58 (citing Bingham v. Zolt, 66 F.3d 553, 559-61 (2d Cir. 1995)) (noting that the Bingham court had found that the "new injuries" had been "caused by a variety of schemes which were related only in their ultimate goal"). Later efforts to conceal the injury, however, are not "separate and distinct fraudulent acts resulting in new and independent injuries," and thus do not cause the "separate accrual" of subsequent RICO claims. Id. at 59-60. The Second Circuit has held that "[c]ollection in later years cannot be viewed as a separate and distinct fraud creating new injuries as it was simply a part of the alleged scheme." Id. at 60. See also Long Island Lighting Co. v. Imo Indus., Inc, 6 F.3d 876, 887 (2d Cir. 1993) (holding that damage resulting from plaintiff's installation of equipment previously known to be defective was not sufficiently independent from the injury caused by the receipt of the defective equipment to give rise to separate accrual); Rafter v. Liddle, No. 05 Civ. 4296 (TPG), 2006 WL 2255093, at *7 (S.D.N.Y. Aug. 4, 2006) (holding that plaintiff's injury was her potential liability for subsequent attorneys fees, and there was therefore no separate accrual when those fees were actually imposed); Nat'l Group for Commc'n and Computers, Ltd. v. Lucent Tech., Inc, 420 F. Supp. 2d 253, 266 (S.D.N.Y. 2006) (refusing to apply separate accrual rule where plaintiff could have discovered "the full extent of related, future injuries at the outset of a single, unlawful scheme"); Pharr v. Evergreen Gardens, Inc, No. 03 Civ. 5520 (HB), 2004 WL 42262, at *2 (S.D.N.Y. Jan. 7, 2004) (holding that it was "beyond peradventure" that each of defendants' monthly mailing of illegal rent bills did not give rise to an injury new and independent from the initial injury caused by the underlying illegality).

   The only post-April 2003 injuries of which Plaintiff complains are the direct results of

the enforcement of, and compliance with, prior court orders and decisions, many of which were the products of Plaintiff's own initiation of proceedings in state court. These injuries flowed directly from Plaintiff's losses in the state court proceedings in or before April 2003, and are not "new and independent" and thus do not implicate the separate accrual rule.

Similarly, the alleged occurrence of RICO predicate acts subsequent to Plaintiff's discovery of his injuries does not affect the accrual of his RICO claims. In Rotella, the Supreme Court reiterated its earlier rejection of the Third Circuit's "last predicate act rule" which had held that a RICO claim accrues when the plaintiff knew or should have known of the injury and the pattern of racketeering activity, and begins to run anew upon each predicate act forming part of the same pattern. 528 U.S. at 554 (citing Klehr v. A.O. Smith Corp., 521 U.S. 179 (1997)). Accordingly, Plaintiff's allegations that the defendants have committed recent acts, namely the mailing of court orders and decisions, even if those acts could be legitimately construed as RICO predicate acts, do not renew or otherwise delay the accrual of his RICO claims.

Plaintiff's RICO claims are subject to a four-year statute of limitations. See Agency Holding Corp. v. Malley-Duff & Associates, Inc, 483 U.S. 143, 156 (1987); accord Pearl, 296 F.3d at 79 n.1. Plaintiff argues that the limitations periods have not begun to run on these claims because the objectives of the RICO conspiracies have not yet been achieved or abandoned. (Opp. Br. 37.) Plaintiff cites several Second Circuit criminal appellate decisions in support of his argument, but fails to appreciate the distinction between criminal and civil RICO claims. Thus, it is true that the statute of limitations for the criminal prosecution of a RICO conspiracy "does not begin to run until the objectives of the conspiracy have been either achieved or abandoned." United States v. Eppolito, 543 F.3d 25, 48-49 (2d Cir. 2008). "[b]ut there are significant differences between civil and criminal RICO actions, and [the Supreme Court] has held that criminal RICO does not provide an apt analogy" for the purpose of determining the civil limitations period, Klehr, 521 U.S. at 188. At any

rate, it is now well established that the civil RICO statute of limitations begins to run, as do other civil statutes of limitations, when the plaintiff discovers, or should have discovered, his injury. See Merrill Lynch, 154 F.3d at 58. Therefore, the limitations period on Plaintiff's RICO claims expired no later than April 14, 2007, and those claims are untimely. Accordingly, Counts VI-IX are dismissed in their entirety.

### Wiretap Act Claims

The Wiretap Act, 18 U.S.C. §§ 2510 et seq., provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C.A. § 2520 (West Supp. 2009). Claims under the Wiretap Act are subject to a two-year statute of limitations, which begins to run from "the date upon which the claimant first has a reasonable opportunity to discover the violation." 18 U.S.C.A. § 2520(e) (West 2003). Therefore, the limitations period on Plaintiff's Wiretap Act claims expired no later than April 14, 2005, and those claims are untimely. Accordingly, Count XIII is dismissed in its entirety.

### Claims Against Soft Split Defendants

The Court has held in abeyance Plaintiff's effort to obtain judgment by default against the Soft Split Defendants, one of whose alleged agent for service of process has denied holding any such authority. Plaintiff's claims against the Soft Split Defendants are of the same nature, and based on the substantially the same convoluted, conclusory and ultimately deficient allegations as those against the other Defendants. Even if proper service were assumed and any well-pleaded factual allegations taken as admitted, the Complaint is plainly deficient to state any federal claim upon which relief can be granted against the Soft Split Defendants. Accordingly, the complaint will be dismissed as against the Soft Split Defendants as well.

State Law Claims

   In light of the preclusion and/or deficiency of Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction of his state law claims. <u>See</u> 28 U.S.C. §1367(c)(3).

<div align="center">CONCLUSION</div>

   For the foregoing reasons, and for substantially the reasons argued in the motions to dismiss the Complaint, the Moving Defendants' motions are granted and the Complaint is dismissed in its entirety, as against all defendants.

   The Clerk of Court is respectfully requested to enter judgment dismissing the Complaint in accordance with this opinion and to terminate all pending motions, and close this case.

   SO ORDERED.

Dated: New York, New York
   March 3, 2011

<div align="right">

LAURA TAYLOR SWAIN
United States District Judge

</div>